ORRAY A. TAFT *vs.* COMMONWEALTH.

SAME *vs.* SAME.

Suffolk. December 1, 1892. — April 3, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Metropolitan Sewerage Act — Eminent Domain — Expert — Public or Private Way — Prescription — Question for the Jury — Record.*

On a petition for the determination of damages for the taking of land for a sewer, a witness is an expert on the effect of sewers who has been admitted as an expert on values, and has testified on the general question without objection, and as such expert he may testify to what extent the taking of part of the land affects the value of the remainder.

Two petitions were brought for the determination of damages, the first for a triangular piece of land taken in fee simple for a sewer, and the second for an easement of building and maintaining a sewer under a long strip of adjoining land alleged by the respondent to be a public way. The respondent asked for an instruction that the petitioner could not recover additional damages for any use which might be made of the land taken, other than erecting buildings thereon; also that the jury could not consider the probability of smells, noise, or smoke as enhancing damages, even if not so offensive as to create a nuisance. These instructions were refused. *Held,* that the respondent was entitled to a new trial. *Held, also,* that perhaps it would be enough to say, that, as the cases were tried together, and as the second must be retried for certain reasons, justice required that there should be a new trial in the first case also, inasmuch as the damages attributable to the taking of the triangle were not clearly distinguished from those belonging to the long strip.

On a petition for an easement of building and maintaining a sewer under a strip of land, the question whether the strip is a public way by prescription is for the jury.

A *relocation of a public way establishing the termini so as to embrace a road* denied to have been part of the way, is conclusive upon all persons who were entitled to be heard in the proceedings which led to it. Therefore such persons cannot recover damages for the subsequent laying out of a sewer *under such road.*

On a petition for the determination of damages for an easement of building and maintaining a sewer under a strip of land alleged by the respondent to be a public way, instructions which lay down too absolutely that, if the public travel bears an insignificant proportion to the private travel over a road, no public way will be established by prescription, are erroneous.

Two PETITIONS to the Superior Court, for a jury to assess the petitioner's damages under St. 1889, c. 439. The first petition was for the taking, by the Board of Metropolitan Sewerage Commissioners, in behalf of the Commonwealth, of a triangular parcel of land of the petitioner at Point Shirley in Winthrop, containing about 12,450 square feet of upland and 9,000 feet of beach, for the purpose, expressed in the instrument of taking, " of using the same for the construction, maintenance, and operation of an underground sewer or sewers, siphons, gate-chambers, and necessary appurtenances." This taking was recorded on April 30, 1890. The second was for the taking by said board, under the statute as amended by St. 1890, c. 270, of " the right to construct, operate, and forever maintain an underground main sewer, and connecting sewers, drains, manholes, and underground appurtenances," in a strip of land 1,000 feet long and 33 feet wide, which the petitioner contended was a private way, forming part of the parcel of land owned by him, and which the respondent claimed was a part of the public highway in Winthrop, called Shirley Street. This taking was recorded on May 9, 1890. The construction of the

main sewer was begun then, and continued in the way through the petitioner's premises until the following October. The following plan shows the petitioner's land, a part of Shirley Street, and the way in controversy.

At the trial, before *Hammond*, J., the jury returned a verdict for the petitioner in each case, and the respondent alleged exceptions in substance as follows.

At the time of the trial, the main sewer had been constructed, but no gate-chamber, siphon, or other works incidental to the crossing of Shirley Gut had been built.

The petitioner had owned since 1853, and controlled since 1848, a parcel of land containing about twelve acres, bounded on all sides but one by the salt water, and the extreme end being the northerly shore of Shirley Gut, with Deer Island on the other side. This land was flat and even, with sandy soil, with no trees, fences, or buildings upon it except the buildings used by the petitioner as a hotel, with its yard, stables, and outbuildings. At the time of the takings there was a way, without fences at the sides, which extended from a point on what was conceded by both parties to be Shirley Street, through land of one Hale, formerly of the Revere Copper Company, and thence in a straight line through the petitioner's land to his hotel, the corner of which was within about two hundred and twenty-five feet of the high-water mark at Shirley Gut; and the respondent claimed that the way extended in the same direction beyond the hotel to the water; but this was denied by the petitioner. This

way was built and maintained by the petitioner at his own expense, and there was no evidence that it was built beyond the hotel. The superintendent of streets of Winthrop testified that in 1885 he, as superintendent, made slight repairs " on the way on Taft's land, . . . filled up some holes, and raked the stone off." This was the only evidence of any work done by the town upon the way across Taft's land.

This way, if it had been extended beyond the hotel, would form the westerly boundary of the triangular parcel above mentioned, the northeasterly boundary line of the triangle beginning one hundred and forty-three feet back from high water on said way, and the southerly boundary being said Shirley Gut.

The petitioner, after putting in evidence copies of the instruments of taking, called as a witness one Wadsworth, who testified that he was a resident of Winthrop; that his business was buying, selling, and renting houses and real estate, including boarding-houses not classed as hotels; that he had rented one hundred and fifty to two hundred houses every season; had sold land at the nearest point to Point Shirley, at Great Head, but had not bought or sold land on Point Shirley; that he was familiar with the petitioner's land and knew its value, and had repeatedly seen the main sewer in process of construction. This was all the evidence in substance as to the witness's qualifications as an expert, and he was not questioned as to his knowledge of the extent or character of the use or construction of the siphon and gate-chamber mentioned in the taking.

After giving his opinion as to the market value of the land in question, the witness was asked by the counsel for the petitioner: " How does the taking of this portion of Mr. Taft's land [referring to the plan] affect the value of the rest, and how does the taking of this triangular piece affect the value of the rest, and how does the taking of the part for the sewer, supposing that a sewer is to be constructed there, affect the value of the balance?" The respondent objected to this question upon the ground that it included as an element of damage the taking for sewerage purposes, as to which the witness was not qualified to state his opinion; the objection was overruled, and the respondent excepted. The witness then answered that the remainder of the petitioner's land would be damaged one half of its whole value,

and further said, in answer to questions by the petitioner's counsel, that one of the principal considerations which led him to this conclusion included the necessary repairing of the sewer, and the interruption of business by interfering with the street, and the knowledge that the sewer was there.

One Newton, called by the petitioner, said that he had lived in Winthrop about eight years; that he had bought a piece of land, with a wharf on it and a building in which he lived, on the harbor side of the town of Winthrop, about a mile and a quarter from the petitioner's land, for which he had paid four thousand dollars, and that he had dealt in other land in Winthrop, mostly in the centre of the town, and land on the shore, amounting to two or three thousand dollars more, and that he knew the petitioner's land on Point Shirley, and had visited it while the sewer was constructing there ; that the four thousand dollar lot mentioned was the nearest to Taft's that he had dealt in, and that he had his own idea of the market value of real estate in Winthrop in the neighborhood of Taft's. No other evidence of his qualifications as an expert was offered, nor any evidence to explain or describe the siphon, gate-chamber, or other works which it might be necessary or proper to have upon the triangular parcel in connection with the main sewer, except the instruments of taking. After testifying to the value of the land in question, the witness was asked by the petitioner : " Now, I want you to consider the way the balance of the land is left after taking this piece out here [referring to the plan], this piece off here [pointing out the triangle], and the fact that the sewer is to be constructed, or has been constructed, through this portion there, and that portion is taken by sewerage commissioners to be used in some way in connection with their works; how is the balance of the property affected ? " The respondent objected, upon the same ground as above stated. The objection was overruled, and the respondent excepted. The witness then said it would hurt the whole of the petitioner's land one quarter of the full value.

One Floyd, called as a witness by the petitioner, after having been qualified as an expert upon the value of real estate at Point Shirley, but without having been examined or any evidence offered as to his knowledge of the effect of the construction of sewer or other works of similar character upon the market

value of land, after he had heard the testimony brought out in cross-examination of the respondent's witnesses as to the nature of the works required for the construction and operation of the sewer in question, was recalled, and testified as follows : " *Q.* When you testified to the damage to Mr. Taft's land, from this sewer construction, the other day, did you consider the possibility of an overflow on that triangular piece of the sewerage into Shirley Gut? *A.* I did not. — *Q.* What change, if any, will you make in your testimony in view of that consideration ? *A.* I will not make any change in my testimony, but my judgment, I think, was different then. I considered that there would be hardly anything, as I remember it, that would be called a nuisance, and on that consideration I fixed a price. If I am asked now to fix a price, considering that there is to be an overflow — *Q.* What difference will that make in your judgment ? " The question was allowed, the objection of the respondent overruled, and the respondent excepted. The witness then answered : " I placed the price then, not knowing what it was to be used for, at fifty cents a foot; I should add twenty-five cents a foot more to the price."

One Meredith, called by the petitioner, testified as an expert to the value of the land taken, and stated that the taking for sewerage purposes injured the remaining land; that the State, as he understood it, had the right to have a large engine pumping night and day in a brick structure like one of those electric light stations in Boston, and that no power on earth could prevent it; that this formed part of his estimate of the damage; and that the value of the whole of the petitioner's land, including the buildings before the taking, was thirty-five thousand dollars, and the damage by the takings he placed at twenty thousand dollars. Upon cross-examination he stated that if it were made certain by law, or in any other way, that no pumping station could be put there, and that no structure other than a stone structure amounting practically to an enlarged manhole two or three feet above the surface of the ground could be constructed, and that he had no right to take into consideration damage from odors, and that the opening of the gate-house would not occur oftener than in ordinary manholes in the streets; that he would consider the damage would be very slight beyond the value of the land taken, which he placed at twenty-five cents a foot for the tri-

angular parcel, throwing in the beach at that price for the upland
without extra compensation, and ten cents a foot for the strip one
thousand feet long and thirty-three feet wide.    The petitioner
called a large number of other witnesses on the same questions.

The respondent put in evidence, without objection, the report
of the State Board of Health, referred to in the St. of 1889,
c. 439, above mentioned, from which it appeared that the main
outlet of the northern trunk sewer was situate under the harbor
at the outer end of Deer Island, about one and a half miles from
the petitioner's premises.    The siphons were inverted iron pipes
to go under the bed of Shirley Gut ; and the gate-chamber was
an underground chamber adapted for shutting off, by gates, the
flow through one or more of the siphons.    Such gate-chambers
might be raised above the surface of the ground to a height
of two or three feet, or, if found desirable, to the height of an
ordinary building; but there was nothing in the plan of sewerage
described in the report which would render the use of a steam-
engine on the petitioner's premises, taken as aforesaid, necessary
or convenient, and the sewer had been constructed throughout
the length of Deer Island at a level which would allow sewage to
flow by the force of gravitation from the petitioner's premises,
so that there was no occasion for lifting it by means of pumps
at that point.    The report contained an estimate of the cost of
an overflow at Shirley Gut.    The respondent's witnesses testi-
fied that the discharge through an overflow, if used, would be
of the same character as the water in a mud-puddle.

The petitioner testified that he became acquainted with the
property in 1830, and controlled it after 1848 ; that in 1827 a
small building was erected there to entertain people who were
accustomed to land on the beach; that the people on Deer
Island were in the habit of crossing over Shirley Gut and going
on Point Shirley and up through the town to Boston ; that after
the erection of the public institutions on Deer Island, before
1850, the prisoners were transported in the same way until on ac-
count of the annoyance that method of transporting was stopped ;
that the point was originally covered by salt-works, and that in
1850 he tore them down and built the driveway ; that the people
were wont to walk on the driveway or go anywhere they pleased
over sea-beach and upland and that he never made any objection
except to heavily loaded teams and on account of some differ-

ences he removed a wharf where people were accustomed to land; that, many years before, the Mystic water-pipes were laid through the way for the city of Boston, and the Revere water-pipes for his own estate; that telegraph poles were put across his land, but not in front of the house, the wires being attached to the buildings; that he never knew or heard that the driveway down to his house was ever designated by the name of Shirley Street; that members of the city government are still likely to pass over to Deer Island at any time, and parties are likely also to come any time by permits, and that he denied the jurisdiction of the county commissioners in their relocations in 1875 and 1884.

There was also evidence that there had been a horse railroad upon the way in question, some eighteen or twenty years ago, which went down in front of Taft's hotel.

One of the petitioner's witnesses, upon cross-examination, testified that from 1849 until 1857 the repairs upon the way in question were always done by Taft and the folks at Deer Island; that he remembered the way since 1844; that from 1848 until 1857 he went from two to seven times a day over the street; and that he ran a public conveyance from Taft's hotel to Scollay Square, Boston. There was a wharf upon the other side of Shirley Gut, on Deer Island, where a boat was kept and used for ferrying passengers across, and teams were taken across on scows by persons employed by the city of Boston. There was no way, public or private, other than the way in question, which connected the petitioner's hotel or the parcel of land owned by him with Shirley Street, or any public street.

A large number of witnesses, called by the petitioner, and including many old residents of Winthrop, testified that the way in question, after it was built by Taft, had been used and travelled upon by any person who chose, without hindrance; and that prior to that time people had been in the habit of going over the petitioner's land without hindrance to and from his hotel and Deer Island.

The respondent put in evidence a record of the town of Winthrop, showing that in 1868 a street was laid out by the town from a point near Revere Street to Point Shirley, the description being "as marked by stakes on the ground, and according to a plan made by John Lowe." It was agreed at the trial that this plan had been lost. A witness who had worked with Lowe and

had seen the plan testified that this was not a new street; that it was intended to follow the same course as the old street, said to be two hundred years old; that the street did not cross or touch Taft's land, and that the terminus of this street at Point Shirley, as shown on the plan, was at the wharf of the Revere Copper Works, about fifteen hundred feet west of the terminus of the way across the petitioner's land, which way intersected the street laid out in 1868, as shown on the plan, at a point about one thousand feet back from the water.

It was admitted that this street, from the town up to the point of intersection, in 1875 and for some time before, was called Shirley Street. Beyond that point, it was contended by the petitioner that only the westerly branch was called Shirley Street. A large number of witnesses, long resident in the town, testified that the way through Taft's land never was known as or called Shirley Street, to their knowledge. The respondent contended that the easterly branch (the way in question) was known as or called Shirley Street, and introduced some evidence to that effect, though the petitioner's evidence upon this point preponderated. In 1868 the selectmen drove stakes on each side of the branch leading through Taft's land, at the boundary line between his land and that of Hale, where stone bounds were afterwards placed. No evidence of the time when the westerly branch was constructed as a road was introduced, but the testimony of the witness upon this point was as follows:

"Q. On that plan of 1868, how much of it was new and how much of it was old part of Shirley Street? A. We proposed to go right where the original was.

"Q. That is, you intended to go where the former street was? A. Where the former street was, the old landmarks, the old town way, which went away down some two hundred years, as we found in Chelsea.

"Q. Then it was not a travelled street as shown on the plan? A. It was a travelled street down to the Revere Copper Company's. When we turned and went to the schoolhouse, and then turned to the left and went to the shore, it was not a travelled way; it was open, no fence or anything of that kind, but not a street.

"Q. But there was also an equally travelled way to Taft's at that time? A. When we got to Taft's, we put a stake up on

each side where he turned to go down to his house, and they went to Deer Island; and a few weeks ago the stones were still there where we drove the stakes.

"*Q.* Do those stone bounds correspond with those stakes? *A.* Well, we drove stakes, and afterwards the stone bounds were put there.

"*Q.* Did you drive stakes in the position where those stone bounds are? *A.* We put stakes on each side of his private way; I cannot tell you where they are now. I think they are there now, or were a few weeks ago.

"*Q.* Between this land and the land of Hale? *A.* I presume it is Hale, but I have not seen it. The other by our street was filled in, and I was shown where they were; we went to find out where our road was in relation to Short Beach."

The respondent put in evidence the record of the county commissioners, and claimed that it showed the location of a public street across the petitioner's land in 1875.

The record declared that the county commissioners adjudicated the locating anew of Shirley Street, being a continuation of Winthrop Street towards Point Shirley, commencing at the junction of Winthrop and Beach Streets, and being forty feet wide. Then follows the description of the street through the town, and the description goes on: " From this point to Point Shirley the road is but thirty-three feet in width, and is intended to be the same location as was laid out by John Lowe, civil engineer, in 1868, the centre being $16\frac{1}{2}$ feet westerly of corner of lot above referred to, and curving around eastwardly the slope of what is known as ' Green Hill,' belonging to Tewkesbury and others, $16\frac{1}{2}$ feet parallel from railing and sea wall about S. 35° 40' W. 475 feet, then S. 1° W. 250 feet, thence S. 34° E. 410 feet, thence S. 42° E. 390 feet, to the line of the property claimed by the Revere Copper Company, thence S. 9° E. 225 feet, thence S. 36° W. 940 feet, thence S. 30° E. 1,290 feet, thence S. 1° E. 525 feet, being $16\frac{1}{2}$ feet east of the grounds of Revere Copper Company's works to land of Taft, thence same course 1,025 feet, to beach at Point Shirley. A road was located by Mr. Lowe commencing 250 feet back from the last angle named (course S. 30° E.) and deflecting westward runs by land of said Copper Company S. 40° W. 572 feet, thence S. 87° W. 228 feet, thence S. 36° W. 475 feet, to the beach, passing west of the Revere

Copper Company's works. This was located thirty-three feet wide. The above description is intended to conform to plans of the same, as made and surveyed by George Wadsworth, civil engineer, and as now defined are hereby relocated."

The certificate of the clerk of the county commissioners was admitted, by consent, as evidence that there was no such plan as referred to in the record in his office, and that he had never known of the existence of such a plan.

The petitioner objected to the introduction of the record, first, because the plan referred to was not produced, and, secondly, because the county commissioners, in relocating Shirley Street, exceeded their authority in attempting to lay a street across petitioner's land where no street of that name had previously existed.

The respondent also introduced in evidence the record of the county commissioners for Middlesex County, in 1884, and also introduced the plan therein referred to. The description of Shirley Street as relocated and established ran through the town, along Short Beach, past the land of Hale (formerly of the Revere Copper works) to high-water mark, substantially as given on an annexed plan. The description continued : " Also a branch commencing at a point in the easterly line of Shirley Street 132.29 feet north of point marked K on plan, and running in a curved line on a radius of twenty feet a distance of 47.72 feet; thence in a straight line tangent to said curve in a southerly direction $542\frac{13}{100}$ feet to the division line between lands of S. W. Hale and another, and O. A. Taft; thence making a slight angle to the left and running about one thousand feet to high-water mark, said line coming on corner of piazza of Taft's hotel, as shown on plan. The opposite side of said branch of Shirley Street is thirty-three feet east of, and parallel with, the above described line, and is connected with the easterly line of Shirley Street by a curved line of 47.5 feet radius. For further particulars see plan made by Whitman and Breck, surveyors, which plan is made a part of this description, and which description is intended to conform to said plan."

The respondent contended that this record showed a location of a public way across Taft's land in 1884. The petitioner objected to the introduction of this record for the second reason above stated, and because the petition appeared to be made by tax-payers and not by inhabitants of the town.

There was no evidence that a copy of the location of 1875 was ever transmitted by the county commissioners to the clerk of the town of Winthrop, and the present clerk testified that there was no such copy in his office, and that he had never known of any such copy.

A copy of the location of 1884 was transmitted to the clerk of the town of Winthrop, at his request, by the clerk of the county commissioners, in 1890, prior to the takings by the sewerage commissioners, above mentioned.

The petitioner testified that he never knew anything of these actions by the county commissioners, and never applied for or received any compensation for the laying out of the way.

It was shown by the evidence of the superintendent of streets of the town of Winthrop, that in 1884 he placed two stone bounds upon the lines of that part of the street which extended over the petitioner's land, both at the end next to the estate of the adjoining owner, and at Point Shirley near the line of high-water mark.

The description of the location in 1875 coincided, substantially, with that of 1884, and the taking by the Commonwealth of the easements in question, viz. the record taking, was within the lines described as a "branch" in the commissioners' record last mentioned. All the evidence material to the question of whether or not the way through the petitioner's premises was a public way or a private way at the time of the takings by said sewerage commissioners, is herein substantially set forth. Upon all the foregoing evidence, the respondent asked the judge to rule that the way was a public way, either by prescription or by record, a town way or highway, which ruling was refused, and the respondent excepted.

The respondent in its prayer asked the following instructions:

" 1. That the petitioner can recover no damages under his second petition for the taking of the rights in question. 2. That the petitioner cannot recover additional damages in these proceedings for any use which may be made of the land taken, other than erecting buildings thereon. 3. That the jury cannot consider whether offensive smells, noise, or smoke may not be caused by the use of said premises for sewerage purposes, as enhancing damages, even if not so offensive as to create a nuisance in law. 4. That the city of Boston had a right of way

by prescription over the way in question, at the time of said takings."

The judge refused to give these instructions, and instructed the jury as to the questions raised by the respondent's prayer above stated, as follows:

"1. You have also the right to take into account the purpose for which it was taken. The taking of this triangle for a public park, might possibly be considered by you to be a benefit to the adjoining land; and nothing is more common than for an assessment of betterments to be made, where parks are constructed, upon land adjoining, on account of benefit caused by the park. Another use might seem to you to be objectionable, and it is claimed by the petitioner that the use to which the property is put is of itself a detriment to the market value of the remaining land. I instruct you that in so far as that sewer comes nearer to the remaining property by reason of the taking of the triangle you have a right to consider the detriment which it will be to the market value of the remaining property. You have no right to assume that a nuisance is to exist there, except so far as it is a necessary consequence of the sewer. You are to assume that the sewer will be properly taken care of. The existence of the sewer is authorized by the Legislature, but it means a sewer properly taken care of. You are not to assume the existence of any negligence on the part of those who take care of it, but what is the reasonably necessary consequence to the adjoining land by the taking of that land for the purpose for which it was taken. It is contended by the petitioner that, by reason of the tides, a nuisance may be created there. I instruct you that, if nuisances are created by the tide, it is the duty of those who have charge of the sewer to abate the nuisance, and you are not to take that into consideration unless you find that nuisances must necessarily be created, and by the proper operation of the sewer. Even if they are created, it is not the right of the public to create a nuisance. A nuisance may be abated. I mean you are to take into consideration only such objectionable things as arise from a proper use of the sewer.

" I instruct you that whatever works hereafter may fairly be deemed to be important, reasonably necessary or reasonable in the operation of that sewer, which ought to be erected, or could be erected, upon this land if needed, are to be taken by you into

consideration. That is the purpose for which the land is taken. Not only the changes, the physical changes, which have taken place there, but what physical changes are you satisfied upon the evidence it may be reasonably apprehended will take place there in the construction of this sewer? If you find that, by reason of the taking of this land, the market value of the remaining land of the petitioner is lowered, by reason of the fact that the sewer is nearer this land than it would otherwise be by reason of the taking of this triangle, that you may take into consideration. In a word, seeing the fair market value of that strip of land, if you find that the remaining property has been benefited by the taking of the triangle, then subtract from the value of the triangle the benefit; if you find it has been damaged, add the damage to the remaining land to the value of the triangle, and that will be the damages caused by reason of taking the triangle.

"2. As to the strip of land contended by the respondent to be a highway. It is claimed by the petitioner that there is no highway, that it is a private way, that it is his way; that nobody has a right to go over it, and that he can close it whenever he sees fit; that he has kept it open for access to his hotel because his hotel was situated some distance from the line of his land (of course he had the right to build a private way through his own land); and that there has been no use of that road by the public in any such sense as to give the public the right to use it, as to make a highway of it. On the other hand, it is claimed by the respondent that for many years prior to the time when this hotel was constructed, or when Mr. Taft went upon that land, there had always been a way across his land substantially where his road is; that the way had been used by the public, and all persons went upon it or through the land as they saw fit, and that the public had so gone; that it has been recognized as Shirley Street; that the county commissioners have been upon it and have laid it out as Shirley Street, and that it is a public highway, and was at the time this thirty-three feet strip of land was taken. This is an important question, because I instruct you, as matter of law, that if that was a highway, a public street, then the petitioner cannot claim any damages for the construction of the sewer in the street, or for the taking of the land. As it is contended by the Commonwealth that the street

ran the whole length of this strip of land, if you find it did so run the whole length, and was a public street, then I instruct you that this petitioner cannot recover under his petition for the taking of the land.

"Speaking generally, it may be said that, when land is taken for a public street, damages are supposed to be given to the landowner for whatever uses, incidental to its use as a street, the land may be hereafter put to by public authority. Horse and electric cars now exist in our public streets; they may be said, perhaps, to be a more detrimental use of a public street, or at least a different use of a public street, from that in which travel ordinarily was. And yet no abutter upon the line of a street has any claim for damages by reason of the existence of these cars upon the street. Sewers, water-pipes, and gas-pipes are laid in the street, telephone poles and telegraph poles are erected; and yet, in the absence of any special provision giving damage for such a thing, it is held that he who abuts upon a highway or even he who owns the land to the middle of a highway, subject to the rights of the people to such highway, has no claim for damages for these various things. And I instruct you that in so far as this sewer ran through the public highway, the abutter upon the highway, or the man owning land at the end of the highway, has no claim for damages caused by the taking of the land in the highway for the construction of that sewer, or for the interruption to the use of the highway while the sewer is being constructed.

"One claim of the petitioner is that he has been hindered in the use of his hotel by reason of the blockade of that way. If it is a public way, he cannot recover. If it is a private way, he can, within certain limitations which I shall give you in a moment.

"How are you going to tell whether that was a public way or not? By what rules, on what evidence, are you to decide that question? Often public ways are laid out by record. Sometimes one board of public officers, sometimes another, but always a board of public officers, lay out a street where it is laid out by record; and then the only thing which it is necessary to do in order to show that a certain street has been laid out as a street is to bring the record disclosing that fact, and show that entry has been made upon the street for the purpose of constructing it within the time required by law. It is not necessary to

show there has been any public travel upon it, if it has been so laid out.

" Ways may exist also by prescription. If you allow somebody to pass over your land under a claim of right for twenty years, thereafter you cannot dispute that right; you have had twenty years in which to dispute it; the man has exercised the right for twenty years, and if you allow him to do it for twenty years, he has a right there exactly as if you had given it to him by deed. So streets in this Commonwealth are formed in this way; and in many cases in this Commonwealth you cannot find the records, the street never was laid out by record, but it had its origin in this, namely, that people, the public, under a claim of right, have walked over the land for twenty years or more, and, having so walked, the street becomes a highway; a public highway, to be supported at the expense of the public, and having all the elements of a highway. Those are the two methods of laying out highways which are material to these cases.

" It is contended by the respondent that this highway was laid out by prescription, that is, that people have gone over it; that the public have gone over it under a claim of right; not that each man as he entered said he had a right to it, but as if having the right, and with the consent of the owner, the public have gone over it for twenty years, so that it has become a highway. That is, that it was such a highway before 1890, when this land was taken. In addition to that it appears that in 1875 the county commissioners of Middlesex County, who were the public authorities charged with laying out ways in Winthrop, laid out this way; and that they did it in 1884 also. But I instruct you, as the petition to the county commissioners in 1875 did not ask for the laying out of a new way, but only for the alteration and relocation of an old one, and Shirley Street is the only street that is named in the petition that is applicable to this land, that, that laying out is not to be taken by you into consideration, unless you find that this land in which this strip was taken, or some part of it, was Shirley Street, so called, and known as Shirley Street, or unless it was a highway before 1875.

" I had better speak of it first in reference to whether it is a highway by prescription. If it is a highway by prescription, you do not care anything about the records. I instruct you, as matter of law, that if you are satisfied that the strip of land

shown upon the plan has been used as a highway by the public
travelling over it under a claim of right, continuously and unin-
terruptedly, that is, substantially, when any one desires to go
over there, that there has been an adverse, continuous, and unin-
terrupted use of that land by the public in passing over it as
the public would be likely to pass over a street in that vicinity,
then it is a highway, whether it was ever laid out by the public
authorities as such or not. But it is necessary for it to be shown
to you that the public went over it as the public, that is to say,
that people travelled there as they saw fit without permission or
without relying upon the permission of the owner, under a claim
of right, acting as if they had the right there, and that that
travel has been continuous, that is, never interrupted by a fence,
and has been what might be regarded as public travel; not that
people must go across there every day, but, having the occasion
to go in that vicinity, people, if they went there under a claim of
right, crossed the road and were never interrupted, and that has
continued for twenty years consecutively, then I instruct you
that the land over which such travel went was a highway. And
as it is not claimed, as I understand it, that the present avenue
differs any from the highway, if any did exist there, then it
would be a highway; if before 1875 any portion of the present
avenue was so used and was called Shirley Street, not that it
was the only street so called, but if it was known as Shirley Street,
not if that is the only name it was known by, but if it did have
the name of Shirley Street, if it was a highway prior to that
time and had that name, then it stands as laid out in 1875 and
as laid out in 1884. And if boundaries were thereafterwards
placed, then that is a sufficient taking of the land to justify you
in finding that the highway was laid out in 1884.

" There is no claim of a record prior to 1875. This highway
then, if it existed before 1875, existed by virtue of prescription,
that is to say, by virtue of twenty years' travel, as I have ex
plained it to you. And if you find that the people, that the
public, under a claim of right, continuously, that is, without
interruption, travelled over the land in which this sewer is, this
thirty-three feet strip of land, then that was a highway. If you
find that they travelled over any part of it, and it was known as
Shirley Street commonly, no matter whether there was some
other Shirley Street or not, no matter whether it had some other

name or not, if one of its names was Shirley Street, then I instruct you that the county commissioners had the jurisdiction to alter and change it in 1875 and in 1884. And as it is not contended that any different or other line was taken in 1884 than in 1875, or that the street was changed in any respect by that laying out from what it was before upon the surface of the ground, I instruct you that the making of boundary lines, the setting of boundary stones upon the street or upon any part of Shirley Street, whether there or elsewhere, is a sufficient entering to establish that laying out. If there was a highway there, then I instruct you there can be no recovery under this first petition.

" It is felt by counsel that I have not stated some things that ought to be stated to you with reference to when the use of land which a man himself uses for a street by the public may make it a public highway. It is conceded by the petitioner that this strip of land was used for going to and from his house, and that it was used by many people; in fact that it was the only access by land to his house, and it is felt that I have not stated to you what sort of use it is that, where there is a private use, will justify a claim that the street is public. I will use two illustrations. It sometimes happens that a man travels over his own land himself, he and his agents and his servants, in the exercise of his right as the owner, and as agents and servants and visitors go over and see him, not exercising any right against him, but using it under his rights. In some places where there are large manufactories, we sometimes find this condition of things. A lot of land is bought, a factory is put up, and the corporation owning the factory and the land builds houses, and it is possible you can conceive of a case where there is a street on the north side and a street upon the south side, and the factory perhaps upon the east, of a certain lot of land, — the corporation buy that land, cut it up into lots, and put a private street through for their own accommodation and for the accommodation of their employees who live in' the houses. And you will see cases where those private streets are constructed like a public street, with sidewalks, with brick buildings on each side, running from the street upon the north to the street upon the south, so that anybody passing by would, perhaps, see no difference between that way and a public street. The idea of the corporation, in forming the street that way, is to accommodate

the people in the houses, their visitors, the marketmen, the grocers, and such other people as have occasion to transact business with the people in those houses. That is a private street, although it may happen that many travellers, not seeing the difference, will go through that street, not having any business whatever with the people upon the side of the street. That is to say, the private travel there to and from those houses is the main purpose of the avenue, and the travel of a few people through there as a part of the public, not having business with those in the houses, is merely incidental and insignificant compared with the private travel. In such a case as that, although you might be satisfied that for years the public had, to a certain extent, travelled through such a road, yet, as the road itself is so much more travelled by the private persons for private purposes and private reasons, that the public travel bears an insignificant and merely incidental relation to the private travel, n? public road would be formed by such public travel.

" On the other hand, suppose there is a way over a man's land in the country, and he goes over it perhaps once a year logging in the winter, but the public go over it constantly and freely, so that you may say that in that case although there is an exercise of a private right to go there by the man who owns the land, still that the main purpose and object of the road is for public purposes, and that the public use of the road outweighs, to a great extent, the private use, — indeed, that the private use is small in fact, while the public use is considerable, — in such a case of public use as that, you might well be warranted in finding that the public had made a public use of the road, and that it would in time, at the end of twenty years, be a public highway, although somebody had travelled there in the exercise of a private right. So when you come to the strip of land over which people have travelled in the exercise of a private right and also in the exercise of a public right as one of the public, and are asked to say whether the travel of the public has been such as to make that a highway at the end of twenty years of such travel, you are to take into consideration the relative importance of the public and the private travel, and to say whether one outweighs the other to such an extent as to authorize you in finding that, as such public travel, the public have acquired the right. And you can get the best at this by the illustrations which I have stated.

It is not necessarily fatal to the acquirement of a public right by twenty years' travel that somebody has also travelled over his private road. And on the question whether twenty years' travel by the public over a given strip of land makes a highway, you may take into consideration the relative importance and bearing of such travel with reference to the private travel over the same land. In this case, if you find that the private travel over this highway, over this strip of land, altogether outweighed the public travel, and that the public travel was insignificant, merely incidental in comparison with it, then, notwithstanding the public went over that road, if that was the nature of the public travel, you might be justified in finding that no right existed, although there had been such public travel.

" It is stated to me by the respondent that it is possible you may be satisfied that although the city of Boston in its corporate capacity had acquired no right to travel there, yet that there was a private right to go across other than a public right. That is to say, even if you should not be satisfied it was a public highway, still that it might be that some people had the right to travel across there in the exercise of a private right; that is, that the city had a right to go across there, its agents and servants, in the exercise of a private way, to go to Deer Island. If you find that that was not a highway, but still find that there was a right to the inhabitants of Deer Island or those who do business with them to go across there, not such as to make a public way, but to give the inhabitants of that island a right to go across, that would not prevent Mr. Taft from maintaining his petition here for damages, but would limit the amount to which he would be entitled if you find that that land had been devoted to private travel, and it was not so much of an encumbrance upon it to put a sewer on it as it would have been if it had not been devoted to private travel."

The respondent excepted to the refusal to give the instructions prayed for by him, and also to those given, so far as inconsistent with its prayer.

The jury found for the petitioner in each case ; and the respondent alleged exceptions.

*W. D. Turner*, for the respondent.

*C. S. Lincoln & S. J. Elder*, for the petitioner.

HOLMES, J. These are two petitions for the determination of damages under the Metropolitan Sewerage Act, St. 1889, c. 439, § 4. The first is for a triangular piece of land on Point Shirley at Shirley Gut, taken in fee simple for a sewer, etc. The other is for an easement of building and maintaining a sewer under a long strip of adjoining land alleged by the respondent to be a public way. The petitions were tried together, and the case is here on exceptions.

The first exceptions were to allowing certain experts to testify how the taking of a part of the petitioner's land for a sewer affected the value of the rest. The only ground stated for the objection in the first two instances, and seemingly the only one in the last, although that is not quite so clear, was that the witness was not qualified to state his opinion. We see no reason for revising the action of the presiding judge on this ground. It was said that the witnesses were not experts on the effects of sewers. But they had been admitted as experts on the values, and had testified on the general question without objection. We cannot say that it was wrong to allow any proper questions of detail. Experts may be asked the effect of a taking. *Vandine* v. *Burpee*, 13 Met. 288. *Brainard* v. *Boston & New York Central Railroad*, 12 Gray, 407. *Dickenson* v. *Fitchburg*, 13 Gray, 546, 557. *Chandler* v. *Jamaica Pond Aqueduct*, 125 Mass. 544, 552, 553.

The next question with which we have to deal is more difficult. Whatever may have been the implied ground of the objection to the foregoing evidence, in one instance it was general in point of form. Later, the respondent asked for an instruction that the petitioner could not recover additional damages for any use which might be made of the land taken other than erecting buildings thereon. Also, that the jury could not consider the probability of smells, noise, or smoke as enhancing damages, even if not so offensive as to create a nuisance. These instructions were refused, and the respondent excepted. The testimony of the experts enhanced the damage to the petitioner's remaining land from the fact that the part taken was to be used as a sewer, on various grounds, such as the possibility of a brick structure with pumping engines, (which there was no ground to anticipate on the evidence,) the possibility of a nuisance from an overflow

at Shirley Gut, (of which, at most, there was but a scintilla of evidence,) the interference with the street by necessary repairs, knowledge that the sewer was there, underground. The jury probably understood, from the instructions they received, that after having allowed the value of the land taken, and any harm to the remaining part in point of size, shape, etc., (*Maynard* v. *Northampton*, 157 Mass. 218,) they had a right to add any and all diminution in the selling value of the latter due to the prospect of a sewer, as we shall state hereafter, subject to the caution, based on *Badger* v. *Boston*, 130 Mass. 170, that they were not to consider the possibility of a nuisance being created by keeping the sewer improperly. We think that the questions raised by the instructions are fairly open. There is no doubt that they had a most important bearing on the amount of damages allowed.

What the presiding judge had in mind evidently was a refined exception to a rule of uncertain scope. The rule denies the allowance of damages for some quasi nuisances, such as smells, etc., in proceedings under various statutes. *Eames* v. *New England Worsted Co.* 11 Met. 570. *Presbrey* v. *Old Colony & Newport Railway*, 103 Mass. 1, 6. *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27. *Proprietors of Locks & Canals* v. *Nashua & Lowell Railroad*, 10 Cush. 385, 392. *Massachusetts Central Railroad* v. *Boston, Clinton, & Fitchburg Railroad*, 121 Mass. 124. Whether this rule would extend to a nuisance which would have been actionable but for a statute authorizing works of which it was a necessary consequence, is a question. The lines of decisions just referred to started from the assumption that the harm either was *damnum absque injuria* or remained actionable. *Eames* v. *New England Worsted Co.* 11 Met. 570, 572. But some statutes may authorize works such as we have supposed, and in such cases, in order to subject neighboring lands to the burden, it might be unnecessary, because impracticable, to file in the registry a description of the lands to be affected, such as is required when the surface of the land is to be flowed. *Kenison* v. *Arlington*, 144 Mass. 456. Again, no doubt the Legislature can change the law of nuisance to some extent without compensation. *Sawyer* v. *Davis*, 136 Mass. 239. *Rideout* v. *Knox*, 148 Mass. 368, 372. *Miller* v. *Horton*, 152

Mass. 540,,546.  But we are not aware that it has been decided that the principle of the Massachusetts decisions cited extends so far.  In England the rule seems to be, that those damages can be recovered which could have been recovered at common law for an injury to land, or to an interest in land, had the acts which caused them been done without authority of statute. *Caledonian Railway* v. *Walker*, 7 App. Cas. 259, 293.  Some of our decisions go even further than that, and no uniform principle has been established.  *Marsden* v. *Cambridge*, 114 Mass. 490, 492.  *Woodbury* v. *Beverly*, 153 Mass. 245, 247, 248.  See *Stanwood* v. *Malden*, 157 Mass. 17.

The exception to the Massachusetts rule denying damages for quasi nuisances authorized by statute is that some annoyances, which otherwise could not have been recovered for, may enhance the damages allowed in so far as they are brought nearer to the petitioner's land by the taking of a part of it.  The petitioner is " entitled to recover, not only compensation for the land taken, but also for such injury to his remaining land as is caused by the appropriation of a part of it for the uses for which it is taken."  *Johnson* v. *Boston*, 130 Mass. 452, 454.  Not, it will be observed, an arbitrary principle that taking part of a petitioner's land lets in a claim to damages otherwise not allowable, (compare *Blesch* v. *Chicago & Northwestern Railway*, 48 Wis. 168, 189, 190,) but only that so far as increased proximity is the source of the trouble it may be allowed for.  The difference between the annoyance just outside the petitioner's original parcel and the same in its intended place is the measure.  *Walker* v. *Old Colony & Newport Railway*, 103 Mass. 10.  The distinction, if difficult to apply, is logical with reference to matters in the nature of nuisances which would not have been actionable apart from statute, but it must not be carried too far.

Probably, when it becomes necessary to decide it, the law of Massachusetts will be found to be, that within the limits within which the Legislature can legalize what at common law would be a nuisance, no petition can be maintained if the quasi nuisance is the only damage inflicted on the plaintiff under the statute relied on.  The infliction of such damage is not regarded as a taking of land sufficient to lay a foundation for proceedings.

If land is taken, the extent of the recovery may be affected by the language of the particular statute, but generally speaking, so far as by taking a part of the petitioner's land a source of harm is brought nearer to the part which is left, the damage caused by the increased proximity may be recovered for, whether apart from the statute the source of harm would have amounted to a nuisance or not.

The presiding judge had the principle of *Walker* v. *Old Colony & Newport Railway* in his mind; but we fear that the jury understood the last words of the charge on that point, taking it in the light of the evidence admitted under objection and of the instructions refused, as meaning that, if they found the remaining part of the petitioner's land had been damaged by any of the lawful effects of any prospective sewer or its appurtenances in that neighborhood, either on the land or on the imaginations of men, if affecting the market value, they were to allow the whole amount. Under this head, in view of the evidence, the jury probably took into account, on the one hand, imagined nuisances which would have been actionable unless authorized by the taking, and on the other, possible quasi nuisances which would not have been actionable, and finally the detrimental effect on market values of the mere fact of there being a sewer in the neighborhood apart from any annoyances at all.

Most of these evils, so far as not imaginary, are due to the taking of the easement in the long strip, not to the taking of the triangle. That enables the sewer to be built, and brings it nearer to the petitioner's land than if it were on the triangle. The distinction is particularly important in view of the decision which we have reached upon the second petition. So far as appears, if there is to be an overflow, it is an incident of the use of the long strip, not of the use of the triangle. The only ground suggested for giving more upon the first petition than the value of the land taken, and the diminished convenience, if any, of the remainder in shape or size, was the possible construction of a building with pumping engines. There was no evidence that such a building was to be expected, and certainly a jury should not be told to increase the damages by considering what would be the most disagreeable use to which land

lawfully could be put by an owner. The general possibility of disagreeable uses is paid for in the price of the land. See, further, *Fairbanks* v. *Fitchburg*, 110 Mass. 224.

We are of opinion that there must be a new trial on the first petition, and we do not deem it necessary or advisable to go further than we have done in answering the questions which we have suggested. Perhaps it would have been enough for us to say, that, as the cases were tried together, and as the second must be retried for reasons to be stated, justice requires that there should be a new trial in the first case also, inasmuch as the damages attributable to the taking of the triangle were not clearly distinguished from those belonging to the long strip.

The other exceptions relate to the second petition. The first question is whether the judge ought to have ruled that the strip mentioned was a public way. So far as the evidence that it was so by prescription goes, no reason is suggested why the judge was not right in following the ordinary course, and leaving it to the jury. Apart from any question as to the truth of the evidence, and assuming that the jury would have been warranted in inferring that there was a way by prescription, as no doubt they would have been, they might have found the contrary, on the evidence that some uses were by the petitioner's leave, and some were stopped by him, and possibly even they might have found that there was no defined way at all, but only free wandering by the guests of the hotel and others over sea-beach and upland of barren sand. They were warranted also in not interpreting the petitioner's statement that the city always had a right of way through them, etc., as a concession of the point in dispute.

But it was said, if not a public way by prescription, it was one by record, and the respondent relies upon a relocation in 1875, and another proceeding in 1884. The petitioner denies the jurisdiction of the county commissioners. In the case of the proceedings of 1875, the denial is based on the allegation that the branch road, if there was one, which ran through Taft's land, was no part of Shirley Street, and so that the county commissioners' act purporting to relocate it was void. The judge, in his charge, made the jurisdiction depend upon whether the road was travelled by the public and was known

as Shirley Street. The question is an embarrassing one. Of course a tribunal cannot establish its own jurisdiction by adjudicating it to exist. *Adams* v. *Adams*, 154 Mass. 290. *Miller* v. *Horton*, 152 Mass. 540, 548. No doubt, too, in an extreme case, at least, the objection that the alleged relocation really was an attempt to lay out a new and different way, would go to the jurisdiction. See *Commonwealth* v. *Cambridge*, 7 Mass. 158. On the other hand, one of the objects of a relocation is to make certain what before was doubtful, (Pub. Sts. c. 49, § 31,) and to establish it against and in favor of all the world, by a proceeding to which all interested are parties. If, under the name of jurisdiction, the validity of the proceeding is to be made dependent in every case upon proof that the lines established coincided with those previously existing, the proceeding is of very little value. It may be said that this consideration cannot be pressed to an alleged extension or change of terminus. Yet the terminus may have been the very point of uncertainty. There may have been conflicting evidence before the county commissioners in 1875, as there was before the jury in the trial of this case, as to what was Shirley Street. One of the reasons why it is held not to be necessary to set out the termini of the way named in a petition for relocation would seem to be the possible uncertainty of them. *Hyde Park* v. *County Commissioners*, 117 Mass. 416, 422. There is no reason to doubt that the county commissioners acted in good faith. The road in question was a mere spur of Shirley Street proper, even if not part of it. The decision that it was part of Shirley Street was not absurd, even on the evidence produced at this trial, as to the state of things before 1875. If this reasoning is not sufficient to show that the adjudication of the county commissioners is valid as against all the world, we are of opinion that at least their decision must be held conclusive against a party who might have been heard in the proceedings which led to it. See *State* v. *Rye*, 35 N. H. 368, 377, 378; *Blackstone* v. *County Commissioners*, 108 Mass. 68; *Perry* v. *Sherborn*, 11 Cush. 388, 391; *Old Colony Railroad* v. *Fall River*, 147 Mass. 455; *Brewer* v. *Boston, Clinton, & Fitchburg Railroad*, 113 Mass. 52, 56, 57.

If there was any failure to give proper notice, which we do not intimate, or other defect in the form of the proceedings

which would not be disclosed by the record, advantage can be taken of it only by certiorari. *Foley* v. *Haverhill*, 144 Mass. 352.

In the view which we take of the effect of the record of 1875, it is unnecessary to consider the record of 1884, or the instructions to the jury on the matter of prescription. But we think it desirable to add that the instructions laid it down too absolutely, that if the public travel bears an insignificant proportion to the private travel over a road, no public way will be established by prescription. In making this correction we do not forget the similarity of the instructions before the court in *Weld* v. *Brooks*, 152 Mass. 297. We agree that the proportion is a matter to be considered. But it is not necessarily decisive in the case of a remote and barren point, where the greater part of the travel of course is that of visitors to the hotel situated there. See *McCreary* v. *Boston & Maine Railroad*, 153 Mass. 300, 305.          *Exceptions sustained.*