LEONARD C. SPROW, administrator, *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

Middlesex.    November 15, 16, 1894. — March 13, 1895.

Present: FIELD, C. J., ALLEN, KNOWLTON, & BARKER, JJ.

*Loss of Life — Railroad — Public Way by Prescription — Adverse Use — Acquiescence in such Use — Due Diligence.*

In an action against a railroad corporation for causing the death of a person at a crossing over its railroad, in order to show that the crossing has become a public way by prescription it is necessary for the plaintiff to prove an adverse use continued without interruption for twenty years, and an acquiescence in such use by the defendant.

The fact that there is a private way across a railroad by reservation does not prevent the public from gaining a right to use the way by prescription.

From merely using what is open to use, without more, no presumption arises that the use is adverse.

In determining whether the unauthorized use of a private way is under a claim of right, the final test is, not whether it is greater or less in amount than the rightful private use, but whether it is of such a character as to show the assertion or assumption of a right so to use the way, or a use under the belief that such use is a matter of public right.

The mere posting up of a sign, "Private way," by a railroad corporation, at the crossing of its railroad by a way, is not to be deemed a prohibition of passage by others than those entitled as of right to pass along the way.

In determining whether there was such acquiescence in the use of a way as is necessary in order to establish a public right, mere permission is not enough, but there must be something to show that such permission was accompanied

with knowledge or reason to believe that the way was used under a claim of a public right.

A way across a railroad was reserved in the original deed of the premises to the railroad corporation, given in 1834 by J., who owned a large tract of land on the south side of the railroad. The way was never laid out as a public way, but it led from a highway on the north of the railroad to J.'s land on the south; and the land has since been used for buildings, twenty or thirty houses having been erected upon it, and in 1853 the name of G. Avenue was given to the way, the use of which had much increased, from one hundred to one hundred and fifty persons passing over it daily. It had never been repaired by the city, or treated by it as a public way, on either side of the railroad. Southerly of the railroad there was a steep ascent, which was not kept in such repair as would be expected if it were a charge upon the city. The way on that side passed through an opening less than fourteen feet wide in the fence on the side of the railroad. The general use of the avenue was mainly for the houses situated upon it, but incidentally it was also used by persons going through the avenue to reach some point beyond. Anybody used it who wished so to do, and with teams and vehicles of various descriptions. At the crossing the railroad corporation had put up within its premises a sign, "Dangerous passing. This is a private way." On the outside of the fence the city had also put up a sign, "Not a public way. Dangerous." There was no sign-board such as is required by statute where a public way and a railroad cross each other on a level. *Held,* in an action against the railroad corporation for causing the death of a person at the crossing, that the evidence was not sufficient to warrant a finding that the crossing had become a public way by prescription.

A young woman, possessing good eyesight and hearing, who had lived for several months in a house about fifty feet distant from the tracks of a railroad, was accustomed to cross over them frequently by a private way, which was used quite generally by the public, and which passed through an opening in the fence at the side of the railroad. An approaching train could not be seen until this opening had been reached, and then could be seen a long distance. She left her house about the time when an express train was due at the crossing, on a stormy day, and hurried along the way, intending to take an electric car which was about to start from a station on the opposite side of the tracks. She passed through the opening in the fence and entered upon the tracks, having her umbrella raised, and, walking rapidly, and without looking to see if a train was coming, attempted to cross the tracks, when she was struck by the locomotive engine of the express train and killed. *Held,* in an action against the railroad corporation for causing her death, that the evidence showed that she was not in the exercise of due diligence.

TORT, by the administrator of the estate of Ellen Harrod, for causing her death. The declaration contained two counts, one under Pub. Sts. c. 112, § 213, and the other under § 212. Trial in the Superior Court, before *Mason*, C. J., who allowed a bill of exceptions, in substance as follows.

It appeared that the plaintiff's intestate, who was a colored woman, was killed on June 9, 1892, by being struck by the locomotive engine of an express train of the defendant at a

crossing at grade of a way known as Greenwood Avenue by the defendant's railroad in Newton.

Edward A. Moore testified that he was a motorman upon an electric railway which passed by the crossing in question; that just before the accident he was in the lobby in one corner of the car station waiting to act as motorman on a car which was due to leave there at 12.15 P.M.; that he started the car, and the defendant's train was then near Brookside Avenue, which was the next crossing to the east; that before he got on his car he saw a colored woman on the opposite side of the railroad track approaching the crossing at a fast walk; that the locomotive engine passed him just as he was taking the point of the switch at the siding; that he heard the bell ringing and the noise of the train, and knew the train was coming, as far back as Brookside Avenue, but the bell was not ringing as the engine passed him; that the woman appeared to be hurrying at a fast walk when he first saw her, ten or fifteen feet back from the fence at the side of the railroad; that she came through the fence a very little way when he took his eyes off her; that this was before the train cut off his view; and that she hesitated a little as she got through the fence, as if looking before she got to the tracks.

Gillespie Lawson testified that at the time of the accident he was sitting in the doorway of his house, and saw the woman go upon the avenue; that she walked as fast as she could down the avenue, with her umbrella up, as it was raining; that she went upon the railroad, and before she got across — she was going very fast — she stopped all of a sudden, looked west, then east, and as soon as she looked east made a jump, and was hit by the train; that he heard no bell or whistle, and had no idea there was a train about until he saw it; that it was going fast; that the wind and rain drove from the west, and she held her umbrella toward the west; that she did not stop as soon as she got inside the fence, or as soon as she got to the nearest track, but had passed the nearest track before she stopped; that she did not look before she stopped, and he thought she was about at the second track when she stopped; that he said, when he saw it, "how foolish she was to go before the train, and it was nigh"; and that he did not think she stopped to look, but that she

had got so far when she discovered the train that she was close on to the track.

Hannah A. Dunn testified that she had lived on Greenwood Avenue five years; that she lived in the house in which Ellen Harrod was stopping, right opposite the crossing, and had noticed people using Greenwood Avenue ever since she had been there; that it had been used by ice teams, milk teams, grocery wagons, and builders; that she had seen wagons from Boston with furniture moving out there, and a hundred or a hundred and fifty persons pass there every day; that Harrod could not have seen the train as she came down the avenue from her house until she had passed through the entrance in the fence on the southerly line of the railroad; that Harrod had been stopping in that house from September, 1891, to the time of her death; that she was in general employment, or working by the day, during the time she was there, and took her noon meal away from home; that she said she was twenty-three years old; that she was active and strong, and did washing, ironing, and cooking; and that she, the witness, did not see the accident.

On cross-examination, she testified that the deceased used the electric cars, and had to pass this crossing to get to them; that she had seen her crossing when a train was pretty near before; that, when standing by the fence, one could see as far as the railroad was straight; and that the deceased possessed good eyesight and hearing.

Nellie M. Sprow testified that she was the wife of the plaintiff; that Ellen Harrod was living with the witness in a house on Greenwood Avenue, and had lived there since the fall of 1891; that on the day of the accident she saw Harrod leave the house, and turn down the avenue; that she was taller than Harrod was, and in going down the avenue could not see a train coming from Boston before she got on to the railroad; that it was a cloudy day, and raining when Harrod went out; that Harrod had an umbrella raised; and that the electric car was due at the crossing at a quarter past twelve.

On cross-examination, she testified that she only saw Harrod go out of her door; that she went to the door with her; that it was just a quarter past twelve, and the electric car was coming; that Harrod saw the electric car from the house, and started to

run out of the house; that the electric car was then about opposite the car-house; that the witness would have reason to expect a train whenever she went to the crossing, and always looked; that Harrod rushed to get an umbrella, raised it, and the witness did not see her any more; and that it was quite a steep hill down to the railroad.

Abbie E. Davis testified that she was the wife of Charles D. Davis, and had lived eight years on Greenwood Avenue; that " the road was used by everything that any one wished to come up the street, hacks, ice teams, coal teams, and other teams "; that the city's snow-plough always came up there to make a path; and that it was a way to Newton Centre, and had been in constant use ever since she had been there.

Charles D. Davis testified that he had lived on Greenwood Avenue for eight years, and during that time the crossing had been constantly used by every one who had occasion to go on to the hill, and for the general purposes of a street.

On cross-examination, he testified that the general use of Greenwood Avenue was mainly for the houses that were upon the avenue itself, and for those persons who come to bring supplies to those houses, and incidentally it was used from time to time by persons who are going through to reach some other point beyond; that the city had not laid it out as a public way, or treated it as a public way, and up to the railroad the city did not consider it a public road; and that the grade was fair, but the road was somewhat stony, and not in such repair as he should expect the city to keep it in if it was a charge on the city.

Charles O. Davis testified that he had been a police officer in Newton for twenty-one years, and had lived there twenty-four years; that during that time he had known Greenwood Avenue, and seen that it was open and used for any use; that teams of all kinds, hacks, carriages, hay teams, etc., went across daily; and that he had no record of the number of houses, but should say there were twenty or thirty on the hill, and the inhabitants of these houses used the crossing.

The witness further testified, on cross-examination, that the city had not, to his own knowledge, kept this way in repair, or did not, so far as he knew, treat it as a public way.

Edward B. Trowbridge testified that he had lived in West

Newton thirty-three years, and had known Greenwood Avenue during that time; that it was open and used by all kinds of vehicles, the same as any highway, and by anybody who wanted to go to the houses on the hill and to Mount Vernon Street, which leads from Newton to Newtonville; and that there were ten or a dozen houses on the hill where the people used this way now.

On cross-examination, he testified that the way had never been laid out as a public way, or treated by the city as a public way, to his knowledge, but on the contrary they had put up a sign that it was a private way; and that the first house put up on the Jenison land was put up forty years ago, and as houses have been built the travel has increased.

Charles H. Jenison testified that ever since 1835 he had lived within two or three hundred feet of Greenwood Avenue; that his father, Elias Jenison, in 1834 or 1835, owned the premises on the southerly side of the railroad where this avenue crosses it; that his recollection extended a good many years before they named it Greenwood Avenue; that he remembered it as a way or travelled place ever since he lived there; that it was since 1853 that it was called an avenue; that in 1853 the way led from Washington Street across the railroad track over the hill into Otis Street, a highway; that a considerable number of streets had been put in since; that the way was used for whatever people wanted to use it, and every one used it; that it was an open way; that it had been used in all the ways that any public thoroughfare would be used; and that the way had been open daily and the use was daily since 1853 or 1854, and had increased.

On cross-examination, he testified that his father owned about forty acres south of the track, extending about forty rods along the railroad, and this way was the way to get to that land, and was used to get to it; that from time to time parts of the land were sold, and houses built, and people living in the houses used the way; that he should say there were about twenty houses on the land south of the track now, and that this way was to get from Washington Street to this land; that he remembered when the railroad was built; and that at that time this land was a wood lot upon the hill, and this was the only way to get access to it from Washington Street.

Charles B. Lentell testified that he was division roadmaster of the defendant's railroad, and had been for nine years, and had been for twenty-eight years in the employ of the defendant; that with the exception of a year or a year and a half he had been for all that time familiar with the region where this crossing is; that he had charge of the repairs of the road from Boston to Worcester; that he had repaired Greenwood Avenue, and kept it in repair, keeping the crossing very similar to private crossings; that it differed from public crossings in being on a smaller scale; that he thought that was the only difference; that he kept the planking in repair; and that the surface of Greenwood Avenue immediately outside of the railroad premises was like that immediately inside, — it was continuous, like the continuation of any road.

On cross-examination, he testified that the opening in the fence on the south side was very much less than at a public way; that there were no public way signs; that he did not put up either of the signs that are at the crossing; that the erection and maintenance of crossing signs is under the master carpenter's care; and that it was the duty of the witness to keep public and private crossings alike in a safe condition.

Walter Shepard testified that he was a civil engineer in the employ of the defendant; and that the roadmaster had charge of repairs at crossings.

On cross-examination, he testified that Greenwood Avenue, so far as he knew, was always treated by the defendant as a private way; that there had never been any recognition of it as a public way by the railroad company; that it was reserved in the original deed to the railroad company of that part of the railroad; that his information came from a deed from Elias Jenison to the Boston and Worcester Railroad Company in 1834; and that Jenison's property was south of the railroad, and extended several hundred feet along the road on the south side.

H. B. Chesley testified that he was the division superintendent of the defendant, and kept a record of the trains in and out of Boston; that on all four tracks one hundred and eighty-seven regular trains of the defendant crossed Greenwood Avenue on June 9, 1892, during the whole twenty-four hours of the day;

that the express train in question left its depot in Boston on that day at twelve o'clock, noon, stopped from twenty-five to forty-five seconds at the crossing of the Boston and Providence Railroad, and would have to go a distance of two or two and one half miles to acquire a speed of forty-five miles per hour; that the distance from the defendant's depot in Boston to this crossing is about nine miles; and that no other train was scheduled to be at this crossing at the same time with this . express train.

Edward A. Haskell testified that he was a civil engineer in the employ of the defendant; that from the nearest corner of the house in which the deceased resided to the opening in the board fence at the entrance to the crossing on the southerly line of the defendant's road was forty-four feet; that the width of this opening in the fence was thirteen and eight tenths feet; that from the nearest corner of the house to the southerly line of the track on which the accident happened was about ninety-five feet; that Greenwood Avenue was ascending all the way, and the highest point of the bank was twenty-seven and one half feet above the track; that the fence was six and one half feet high, and constructed of boards seven eighths of an inch thick, placed from one half to three quarters of an inch apart, so that to see through the fence one must be very nearly opposite; that there were two sign-boards, one inside and one outside of the fence, on the north side of the railroad; that there were none on the southerly side; that the board inside the fence was a rectangular sign-board twenty-six inches by twelve inches; that there were two sign-boards on the post outside, about the same size; that the signs were perfectly legible, the one inside being old, the one outside new; that there was no sign with the words, "Railroad Crossing, Look out for the Engine," on it, no gate at the crossing, and no flagman; that Greenwood Avenue, after crossing the defendant's road, entered immediately into Washington Street on the north; that there were electric railway tracks on Washington Street, and near the crossing a white stopping-post, at which the cars on the electric railway stopped; that starting from the crossing the railroad went straight to the west for four hundred and fifty feet, and then curved northerly as you faced to the west; that going easterly from the crossing the

railroad was straight for eight hundred and fifty feet, and then began to curve; that the roadbed lay along the base of a hill, close in to it; that there were houses on Greenwood Avenue, but that they were not numerous; that the roadbed at the crossing was the ordinary roadbed; that there were planks laid down between the rails, spiked down to the cross ties, flush with the rails, with an opening on the flange side of the rails for the flanges of the wheels to pass through; that there was the ordinary and usual preparation for a crossing, and the width of the place prepared for the crossing was ten and one half feet across; that there was no distinction between the way for foot passengers and for carriages; and that outside of the planks and within the location was gravel, of about the same width as the planking, and uniform with the approach on Greenwood Avenue on either side.

On cross-examination, he testified that the preparation for this crossing was the same as that for the crossing of private ways; that there had been no signs to look out for the engine since he knew the crossing; that the rectangular sign-board within the railroad premises had on it, "Dangerous Passing, This is a private way"; that the other two sign-boards had on them, one, "Not a public way, Dangerous," the other, " Greenwood Avenue, Ward 3 "; that the rectangular sign-board was square with the railroad track, and the two signs on the outside of the fence were skewed round so as to face Washington Street; that he knew the crossing signs used at public ways, and never knew one at this way; and that a person at the opening in the fence on the southerly side of the crossing could see a person on the track where the accident happened eleven hundred feet away.

At the close of the evidence, the judge directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

*J. C. Ivy*, for the plaintiff.

*Samuel Hoar*, (*W. Hudson* with him,) for the defendant.

ALLEN, J. In order to support the first count of the declaration, it became necessary at the trial for the plaintiff to show that the crossing over the railroad at which the collision occurred had become a highway or town way by prescription; this count being founded on Pub. Sts. c. 112, § 213. We have

to determine whether the plaintiff had sufficient evidence to entitle him to go to the jury on this question.

In order to show a public way by prescription, it was necessary for the plaintiff to prove an adverse use continued without interruption for twenty years, and an acquiescence in such use by the defendant. Washb. Easements, 86. Adverse use means a use under a claim of right, as distinguished from a use which was permitted. The points which we have to consider are, whether there was evidence of a public use for twenty years under a claim of right, and whether there was evidence of an acquiescence in such use.

It is to be noticed, in the first place, that the origin of the way, according to the testimony, was by reservation in the original deed of the premises to the defendant, given in 1834 by Elias Jenison, who owned some forty acres of land on the south side of the railroad. The way was never laid out as a public way, but it led from a highway on the north of the railroad to Jenison's land on the south; and this land has since been used for buildings, so that now there are twenty or thirty houses upon it, and in 1853 the name of Greenwood Avenue was given to the way, and the use of it has much increased, so that, according to the testimony of the witness who gave the highest estimate, from one hundred to one hundred and fifty persons a day pass over it at present.

The fact that there was a private way across the railroad by reservation does not prevent the public from gaining a right to use the way by prescription; *Fitchburg Railroad* v. *Page*, 131 Mass. 391; *Ballard* v. *Demmon*, 156 Mass. 449, 453; but heretofore we have had occasion to observe that the existence of a private way makes it necessary to examine with more care the alleged public use, to see whether after all it has the characteristic of a use under a claim of right, as distinguished from a use of the private way which was assented to or permitted. *McCreary* v. *Boston & Maine Railroad*, 153 Mass. 300, 305. See also *Smith* v. *New York & New England Railroad*, 142 Mass. 21. If one in walking or driving finds a way open before him, and uses it because it seems to be intended for such use, this alone does not show that he uses the way as a matter of right, and such use would not establish a prescriptive right, no matter

how frequent or how long continued it might be.   Merely from using what is open to use, without more, no presumption arises that the use is adverse.   *Thomas* v. *Marshfield*, 13 Pick. 240. *Kilburn* v. *Adams*, 7 Met. 33.   *Hall* v. *McLeod*, 2 Met. (Ky.) 98. Washb. Easements, (4th ed.) 135.   In other words, there must be something to show that the way is used as a public way, rather than as an open private way.   *Sargent* v. *Ballard*, 9 Pick. 251. This is illustrated by the example of the private streets which exist in some of our manufacturing cities.   They are in appear- ance undistinguishable from public streets; they are kept con- stantly open, and in such a condition that all persons who choose can use them freely.   But they remain private ways, unless use by the public under a claim of right is shown.   *Durgin* v. *Lowell*, 3 Allen, 398.   *Danforth* v. *Durell*, 8 Allen, 242.   It has some- times been suggested that the comparative amount of rightful private use and of the public use which is without absolute right is an important element in determining whether such public use is under a claim of right.   No doubt the amount of such unauthorized use may be considered as tending to show a use under the belief that the way is a public one; but the final test is, not whether it is greater or less in amount than the rightful private use, but whether it is of such a character as to show the assertion or assumption of a right so to use the way, or a use under the belief that such use is a matter of public right.   See *Weld* v. *Brooks*, 152 Mass. 297; *Taft* v. *Commonwealth*, 158 Mass. 526, 552.   In order to show such adverse use by the public it is not necessary that each or any traveller should in express words declare that he claims the right as one of the general public to travel over the way in question.   *Blake* v. *Everett*, 1 Allen, 248. Nor is it easy to express in what particular manner such asser- tion of right should be shown.   Nevertheless the fact must exist that the way is used as a public right, and it must be proved by some evidence which distinguishes the use relied on from a rightful use by those who have a right to travel over the private way, and also from a use which is merely casual, or incidental, or permissive.   The amount, character, and duration of the use of a way by persons who had no lawful right to use it may have been such as to tend to show that such use was under the belief that the way was public.   But the burden of proof being upon

the plaintiff, we are to see if the evidence introduced in this case was sufficient to warrant a finding of a public way by prescription, bearing in mind that a mere scintilla of evidence is not enough. *Hillyer* v. *Dickinson*, 154 Mass. 502. *Commissioners of Marion County* v. *Clark*, 94 U. S. 278, 284. If all the evidence which was introduced was equally consistent with the view that the uses relied on were of the latter character, the plaintiff failed to sustain the burden of proof resting upon him to show a use under a claim of right. *Sargent* v. *Ballard*, 9 Pick. 251, 256. *Smith* v. *First National Bank*, 99 Mass. 605. *Griffin* v. *Boston & Albany Railroad*, 148 Mass. 143.

Let this view of the case be tested by an illustration. If one who has no right to pass over a way nevertheless persists in doing so, in the assertion of a right to use it, without the assent of the owner of the premises, he is subject to an action for the trespass. Upon the testimony introduced in this case, would the railroad company be entitled to go to the jury in an action brought for trespass against any of those who have used the way now in question? Is there any evidence to show that any such use was in the assertion of an adverse right, or without the acquiescence of the railroad company? If not, it goes to show that the plaintiff has not sustained the burden of proof. *Felton* v. *Simpson*, 11 Ired. 84. Washb. Easements, (4th ed.) 86, 87.

It was incumbent on the plaintiff, not merely to show an adverse public use, under claim of right, continued for twenty years, but also that during that period the defendant acquiesced therein. *Hennefin* v. *Blake*, 102 Mass. 297. Acquiescence implies that the defendant knew, or had reason to believe, that there was such an adverse use. The crossing might be used as of private right by the occupants of the twenty or thirty houses built upon the land formerly belonging to Jenison. For their convenience, the way was extended to highways still further south. Persons having legitimate occasion to go to or from those houses might also rightfully use the crossing. Under these circumstances, the defendant was not bound, and probably was not at liberty, to obstruct the crossing by bars or by a gate. *Williams* v. *Clark*, 140 Mass. 238. Looking at it practically, the railroad company might find a difficulty in distinguishing between those who had a right to pass over the crossing and those who had

not. It could hardly be expected that a personal inquiry should be put to each person seeking to cross, who was not known to have a right to do so, nor is the mere posting up of a sign " Private way " to be deemed a prohibition of passage by others than those entitled as of right to pass along the way. *O' Connor* v. *Boston & Lowell Railroad*, 135 Mass. 352. If Pub. Sts. c. 122, § 3, are applicable to railroad corporations, it may be that the acquirement of a public right could be prevented by posting a notice as therein provided. *Ballard* v. *Demmon*, 156 Mass. 449, 453. But the omission to post such notice certainly does not show that the defendant was aware that the crossing was used by a portion of the public under a claim of right, even if the fact was so.. In determining whether there was such acquiescence as is necessary in order to establish a public right, it must always be borne in mind that mere permission is not enough. There must be something to show that such permission was accompanied with knowledge or reason to believe that the crossing was used under a claim of a public right. Until then, no question of acquiescence can arise.

In view of these explanations of the rules of law, it remains to see how far the evidence introduced meets their requirements. Without reciting it in detail, the evidence, in addition to matters already referred to, was to the following effect. Greenwood Avenue never had been repaired by the city, or treated by it as a public way, on either side of the railroad. There was much, also, which was quite obvious to the eye, to call attention to the true character of the way. Southerly of the railroad there was a steep ascent, which was not kept in such repair as would be expected if it were a charge upon the city. The way on that side passed through an opening in the fence, less than fourteen feet wide, which was much less than is usual at a public crossing. The general use of the avenue was mainly for the houses situated upon it, but incidentally also it was used by persons going through the avenue to reach some point beyond. Anybody used it who wished to do so, and with teams and vehicles of various descriptions. At the crossing the defendant had put up within its premises a sign saying, " Dangerous passing. This is a private way." On the outside of the fence, the city also had put up a sign saying, " Not a public way. Dangerous." There

was no sign-board such as is required by statute where a public way and railroad cross each other on a level. Nobody was actually stopped from using the crossing. Anybody crossed there who wished to do so. No witness testified that he thought or asserted a claim that there was a public right to cross there, or that he made it known in any manner that he claimed such right. There was a general statement that the way was used the same as any highway; but no fact was testified to showing that any person who used the way or the crossing, and not having the right to do so under the reservation in the deed, did so under the belief that there was a public right to do so; much less, that he did or said anything to show such an assertion of a general public right as to distinguish him from casual travellers over the way who accepted and acted upon the permission which might be inferred or assumed from the fact that the way was left open to be used as a private way. We find nothing in the testimony inconsistent with the supposition that everybody who passed over the crossing saw the signs, or knew otherwise, or had reason to believe, that it was not a public way, and used the crossing recognizing that it was not. The acts of crossing which were testified to were as consistent with this view as with the assumption that they were under a claim of a general public right. The evidence falls still further short of showing acquiescence by the defendant in such an adverse use. It goes no further than to show a permission or assent by the defendant that others besides those entitled of right to cross at that place might use the crossing at their own risk. It does not show that the defendant knew or had reason to believe that they were using the crossing on any other terms than under its permission. *Deerfield* v. *Connecticut River Railroad*, 144 Mass. 325, 338–340.

The cases of *Fitchburg Railroad* v. *Page*, 131 Mass. 391, and *Johanson* v. *Boston & Maine Railroad*, 153 Mass. 57, which are relied on by the plaintiff, are distinguishable from the present case in various particulars.

There being no sufficient evidence to entitle the plaintiff to go to the jury upon the first count, we come to the second count, which was founded on Pub. Sts. c. 112, § 212. In order to support this count, it was necessary for the plaintiff to show that

the deceased was herself in the exercise of due diligence.   The
plaintiff's evidence shows the contrary.   It was an act of care-
lessness for the deceased to enter upon and attempt to cross the
railroad tracks as she did.   The approaching train might have
been seen a long way off.   She did not look for it.   She was
hurrying along over the tracks, taking no precautions for her
safety.   It is a plain case of a failure to show due diligence on
her part.   *Moore* v. *Boston & Albany Railroad*, 159 Mass. 399.
*Tyler* v. *Old Colony Railroad*, 157 Mass. 336, 339, 340, and cases
there cited.

The direction to return a verdict for the defendant was right.
*Exceptions overruled.*