ARTHUR CHAPIN, Mayor of the City of Bangor, Petitioner,

*vs.*

MAINE CENTRAL RAILROAD COMPANY.

Penobscot.    Opinion December 23, 1902.

*Railroad Crossing.   Highway.   Street.   Prescription.   Navigable Rivers.   Railroad Commissioners.   R. S., c. 18, § 29; c. 51, §§ 31, 33; Stat. 1883, c. 167, § 1; Spec. Laws, 1868, c. 459; Mass. R. S., c. 111, § 148.*

A prescriptive right to cross a railroad track by virtue of an adverse public use cannot be acquired under the existing laws of this state.

The purpose of all the legislation in this state since 1883, relating to the regulation of railroad crossings, has been to place the entire subject under the jurisdiction and control of the railroad commissioners.

On the hearing of a petition under R. S., c. 51, § 31, asking for the establishing of a safe and convenient railroad crossing, evidence concerning a question not presented by the petition is irrelevant and inadmissible.

It is a familiar principle of law that a public way cannot be laid out across a navigable river without the consent of the legislature, for the reason that it would destroy an existing highway, the river itself, in which all citizens have an interest.

It is well settled in this state that in case of the acceptance of a dedicated way only nominal damages are allowable to abutting owners.

The act of a city in laying out an extension of a street under legislative authority therefor, cannot be deemed the acceptance of a way previously dedicated, where the alleged way by dedication is not identical with that actually laid out and where substantial damages are awarded to the owners of the abutting land and other circumstances show a new and original street was to be established.

On report.    Petition denied.

Petition under R. S., c. 51, § 31, asking that the Maine Central Railroad Company be ordered to make a safe and convenient crossing for public travel over its tracks at the foot of Exchange Street in the City of Bangor.    Upon the filing of the petition an order was made directing the respondent railroad company to appear and show cause against the petition.    On the hearing in this court below after the

evidence was taken out, the case was reported for determination on so much of the evidence as is legally admissible.

The case appears in the opinion.

*T. D. Bailey*, City Solicitor, for petitioner.

It is the duty of railroad companies to maintain crossings within the location of public ways. *Portland & Rochester Railroad Co.* v. *Deering*, 78 Maine, 61, 57 Am. Rep. 784.

Counsel argued, in the first place, that, leaving out the special act of the Legislature altogether, the Railroad Company are bound to keep this crossing in repair and well guarded. This street was dedicated in 1801 to Penobscot River. It seems that from the report of this case that the dedicated streets on the plan were accepted by the town soon after the dedication. Here was a dedicated way which we show by our evidence was used as a landing place or slip as early as 1847, and probably was used as early as the dedication. Here was a highway by dedication and immemorial use, and the Railroad Company were as much bound to keep the railroad crossing safe and convenient for public travel as if there had been a location by the County ·Commissioners or the municipal officers. *Webb* v. *Portland & Kennebec Railroad Co.*, 57 Maine, 117; *Kelley* v. *Southern Minnesota Railroad Co.*, 28 Minn. 98.

The public had always used the "City slip," as Mr. Small calls it, and they had a right to use it. So as a matter of law, the railroad company were bound to keep the crossing in repair and safe and convenient, whether the city laid out and established a street or not.

There is very grave doubt whether the proviso in this special act is constitutional. At the time the act was passed by the legislature there had existed for over twenty years a highway by dedication, accepted by the town and used by the public, to the Penobscot River at all stages of the tide. The abutting owners of land on this highway had a right, as inviolable as it is indisputable, to the common and unobstructed use of the contiguous highway so far as it was necessary for affording them certain incidental easements and servitudes, and a convenient outlet to other streets; and this right neither the legislature nor the municipality can deprive them of without consent

or a just compensation in money.    *Gargan* v. *Louisville, etc., Railway Co.,* 89 Ky. 212, 6 L. R. A. 340, or 12 S. W. Rep. 259; *Fulton* v. *Short Route Railway Transfer Co.,* 85 Ky. 640, 7 Am. St. Rep. 619.

An abutting owner's easement in the street in front of its full width for purposes of access and light and air is property which cannot be taken from him for public use without compensation.    *Reining* v. *New York L. & W. R. Co.,* 128 N. Y. 157, 14 L. R. A. 133; *Kane* v. *New York Elev. R. Co.,* 125 N. Y. 164, 11 L. R. A. 640; *Galway* v. *Metropolitan Elev. Railroad Co.,* 128 N. Y. 132, 13 L. R. A. 788; *Lamm* v. *Chicago St. P. M. & O. R. Railroad Co.,* 45 Minn. 71, 10 L. R. A. 268; *Adams* v. *Chicago B. & M. Railroad Co.,* 39 Minn. 86, 1 L. R. A. 493; *Providence Steam Engine Co.* v. *Providence & Stonington Steamship Co.,* 12 R. I. 348, 34 Am. Rep. 652.

In this case is a special act of the legislature, which says in effect that there shall be no public way over a railroad without their consent when there had been one before the location of the railroad for over half a century.    The first use of a street is for the ordinary travel over it; the right of a railroad company to operate its trains across it is subordinate to the use of the general public.    *Houston & T. C. Railway Co.* v. *Carson,* 66 Tex. 345, or 1 S. W. Rep. 107; *Dubach* v. *Hannibal & St. J. Railroad Co.,* 89 Mo. 483, 1 S. W. Rep. 86; *Hopkins* v. *Baltimore, etc., Railroad Co.,* 6 Mackey, (D. C.) 311.

The interpretation put upon the statute by the defendant company makes it take away the rights of the abutting owners below the railroad track and all the other owners on the street.

Again, if the foregoing contentions cannot stand, the city contends that the condition in the special act of the legislature is one which the railroad company cannot take advantage of, for in the face of this condition precedent the city went ahead and laid out and established a way over the tracks of the European and North American Railway Company, they making no objection as shown by the report of the city engineers, and in 1872 the railroad company recognized the laying out of the street by their petition to the city to fill in and wharf up a part of the street so laid out.

If, as matter of law, this was not a waiving altogether of the con-

dition, it, at least, converted the condition precedent into a condition subsequent. *Thompson* v. *Bright*, 1 Cush. 420; *Hooper* v. *Cummings*, 45 Maine, 359; *Willard* v. *Henry*, 2 N. H. 120.

It is well established law that a person or corporation can waive a condition or a statute provision in their favor or even a constitutional right. *Sheridan* v. *Salem*, 148 Mass. 196; *Sharon Iron Co.* v. *Erie*, 41 Pa. St. 351; *Ludlow* v. *New York & Harlem R. R. Co.*, 12 Barb. 445.

That the public or a private individual can gain a prescriptive right to cross a railroad track is well settled. *Fitchburg Railroad Co.* v. *Page*, 131 Mass. 391; *Weld* v. *Brooks*, 152 Mass. 297; *Johanson* v. *Boston & Maine Railroad*, 153 Mass. 57; *Sprow* v. *Boston & Albany Railroad*, 163 Mass. 330; *Bagley* v. *New York, New Haven & Hartford Railroad Co.*, 165 Mass. 160; *Easley* v. *Missouri Pacific Railroad Co.*, 113 Mo. 236.

Though the use of a road was begun by permission, if the use continues under a claim of right for a term of years equal to the period of the statute of limitations, a prescriptive right to the road is acquired. *McAllister* v. *Pickup*, (Iowa,) 50 N. W. Rep. 556.

The heirs of Samuel Veazie and their grantees are estopped to deny the validity of the laying out of the street. *Fernald* v. *Palmer*, 83 Maine, 244; *Sherman* v. *McKeen*, 38 N. Y. 266; *Hunt* v. *Card*, 94 Maine, 386, 389.

Official acts, done in pursuance of authority and duty, are presumed to be legal. After a lapse of thirty years such acts may be conclusively presumed to be legal. *Treat* v. *Orono*, 26 Maine, 217; *Prentiss* v. *Davis*, 83 Maine, 364, 368; *Bassett* v. *Porter*, 4 Cush. 487.

Counsel also cited: Stat. 1874, c. 214; *Boston & Albany Railroad Co.* v. *Boston*, 140 Mass. 87; *Dwelly* v. *Dwelly*, 46 Maine, 377; *Wing* v. *Hussey*, 71 Maine, 185; *Salem Turnpike & Chelsea Bridge Corporation* v. *Solomon Hayes*, 5 Cush. 458; Mass. R. S., 1902, c. 111, §§ 130, 148; *Fisher* v. *New York & New England Railroad Co.*, 135 Mass. 107.

*C. F. Woodard*, for respondent.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, POWERS, PEABODY, SPEAR, JJ.

WHITEHOUSE, J.   The question presented for the determination of the court in this case arises from a written application made by the mayor, as one of the municipal officers of Bangor, to one of the justices of this court, asking that the defendant railroad company be compelled to make and maintain a safe and convenient grade crossing at the foot of Exchange Street in the City of Bangor.   The petition is based on the provisions of § 31 of c. 51 of the Revised Statutes, and comes to the law court on a report of the evidence.

Section one of chap. 459, of the Private and Special Acts of 1868, is as follows:

"The City of Bangor is hereby authorized and empowered to lay out, establish, make and maintain a street or public way from the present southerly terminus of Exchange Street in said city to low water mark in Penobscot River not exceeding sixty-eight feet in width; *provided,* said street shall not be laid out over and across the track of the European and North American Railway Company without the consent of said company."

Section second of the act provides that the damages sustained by any person by reason of the laying out of this street shall be estimated and the benefits apportioned and assessed in conformity with the city charter and chap. 18 of the Revised Statutes.

The written application in this case represents that in accordance with an order of the city council of Bangor passed May 4, 1868, the board of street engineers of the city, on the fifth day of October, 1868, laid out an extension of Exchange Street from its easterly terminus, sixty feet southerly from Washington Street, across the location of the European and North American Railway Company, 68 feet in width for a distance of 228 feet and 4 inches, and 50 feet in width for a further distance of 193 feet and 11 inches, to low water mark.   It is further represented that on the tenth day of October, of the same year, the street engineers made a report to the city council of their proceedings in laying out this extension, and

that on the 19th day of October, their report was duly accepted by the council and the street thereby established.

It is also alleged that this extension of Exchange Street crossed at grade the railroad then operated by the European and North American Railway, and now controlled and operated by the defendant company, and that the defendant is now bound by law to maintain a safe and convenient crossing for public travel over its tracks at Exchange Street.

Although it is thus explicitly represented in this petition that the southerly terminus of Exchange Street prior to October, 1868, was sixty feet southerly from Washington Street, and that the alleged extension of Exchange Street across the railroad track was laid out in October, 1868, the petitioner introduced in evidence a copy of a plan said to have been made by Charles Bulfinch in 1801, for the owners of the land on which a dedicated street then known as Poplar Street, but afterwards changed to Exchange Street, was represented as extending to Penobscot River at low water mark; and he now contends in argument that the street in question is shown by undisputed evidence in the case to have been accepted by the town soon after its dedication and used as a landing place or slip as early as 1847. Thereupon he further contends that the legislative act of 1868, authorizing the extension above described, did not abridge any right which the public had acquired in this street by "use and dedication" and that the defendant company would have been bound to maintain a safe and convenient crossing at the point in question if the extension had not been formally laid out by virtue of the act of 1868. But the case is "reported to the law court for determination upon so much of the evidence as is legally admissible." The petition before the court definitely states the time when the way alleged to have been obstructed by the defendant company was laid out and established. It contains no intimation of the existence of any other way at the point in question except that laid out in 1868, and no allusion whatever to any rights claimed to have been acquired by dedication or prescription or any other means, except the action of the city council in laying out the extension in 1868, therein described by metes and bounds. It is on account of the failure of the defendant company to

make a safe and convenient crossing over the way thus alleged to
have been established in 1868, that this petition was presented to a
justice of this court. It gave the defendant company no information
that evidence would be offered to prove the existence of any other
street, or the establishment of this street at other time or in any other
manner, than that specifically described. It is unnecessary to inquire
whether or not the evidence upon which the plaintiff now relies is
undisputed. The petition gave no notice that an issue would be
raised respecting the existence of a way by dedication or prescription,
and the evidence concerning a question not presented by the petition
is irrelevant and inadmissible. Whether a general averment in such
a petition of the legal existence of a public way would be sufficient to
give the court jurisdiction, it is unnecessary to determine. In this
case the language of the petition effectually gave notice to the defend-
ant that the petitioner had elected to rest his case on the existence of
the street alleged to have been established in 1868 as therein described,
and under familiar rules of pleading and procedure in both law and
equity, the evidence should be confined to the issue thus presented.

But assuming that a dedication of the street in question to low
water mark in 1801, is shown by the plan and other evidence intro-
duced by the petitioner, that fact alone is insufficient to prove the
existence of a legal "highway or town way" over which a crossing
must be maintained under § 31, of chap. 51. A way by dedication is
not constituted by the act of dedication alone; it must also be proved
that there was an acceptance of the way by the public or by the
town in behalf of the public. *State* v. *Wilson*, 42 Maine, 9; *Bangor
House* v. *Brown*, 33 Maine, 309. And a careful examination of the
report in this case fails to disclose sufficient evidence to warrant the
conclusion that the way in question was ever accepted by the public
or by the town in behalf of the public. For obvious reasons the act
of the city in laying out the extension under the act of 1868, cannot
be deemed the acceptance of a way previously dedicated. In the
first place, the way alleged to have existed by dedication is not iden-
tical with that represented in the petition to have been laid out in
1868. The former was only fifty feet in width, while the latter for
a distance of 228 feet, comprising that portion traversed by the rail-

road was sixty-eight feet wide.    Again, it is settled law in this State that in case of the acceptance of a dedicated way only nominal damages are allowable to abutting owners; but when the extension in this case was laid out by the city council in 1868, the substantial sum of $200 was awarded and paid to the owners of the land abutting on the way on the northerly line of the railroad.    The provision of the legislative act requiring the estimation of damages, the proceedings of the city council in conformity with the act and the language of the report of the street engineers expressly recognizing the former terminus of Exchange Street, tend conclusively to show that by the common understanding of all persons and corporations, to be affected by it, a new and original street was then to be established. The locus in question had not acquired a legal existence as a public way by user; for it clearly appears from the testimony of the city engineer introduced by the petitioner, and other undisputed evidence in the case, that the portion of Exchange Street extended in 1868, was all south of the original shore line of the river and hence below high water mark.    In such a case the use of the shore below high water mark as a way for public travel upon the waters of the river is but the exercise of a right, and "no one is presumed to have granted an easement in the right of passage to the public over his land when that right is in the public to the fullest extent." *State* v. *Wilson*, 42 Maine, 9; *Stetson* v. *Bangor*, 60 Maine, 321.

It is a familiar principle of law that a public way cannot be laid out across a navigable river without consent of the legislature, for the reason that it would destroy an existing highway, the river itself, in which all the citizens have an interest.    *Kean* v. *Stetson*, 5 Pick. 492: *State* v. *Wilson*, 42 Maine, 9.    It was exclusively within the province of the legislature to determine whether public convenience and necessity required the extension of Exchange Street to low water mark, and if so, to specify the terms and conditions upon which it should be so extended.    If it could not be extended across the defendant's railroad to low water mark without permission from the legislature, it was competent for the legislature to grant a qualified permission that it might be so extended with the consent of the railroad company.    It has been seen that the act of 1868 provided in explicit

terms that the street should not be laid out across the railroad track without the consent of the railroad company.

It is not in controversy that thereupon the city council proceeded to lay out the extension across the railroad track to low water mark, and to estimate the damages sustained by the abutting land owners. The question now presented for the determination of the court is whether the City of Bangor, in exercising the authority thus conferred by the act of the legislature, complied with the important condition therein imposed by obtaining the consent of the European and North American Railway Company to extend the street across its track.

It was incumbent on the city to obtain the consent of the railroad corporation, and for the purpose of giving its consent the corporation could only be legally represented by its stockholders or board of directors. But there is no evidence in the case that such consent was ever expressly given either orally or in writing, by action of the stockholders, by the board of directors, or any individual member of the board, or by the president of the company. It is conceded that no record can be found on the books of the railroad company either explicitly showing such consent or in any way indicating. that the question had ever been presented for the consideration of the board of directors. There is no evidence of any conference whatever between the representatives of the city and any official of the railroad in relation to the subject.

On the other hand, there is no direct evidence in the case that the railway company ever entered any protest against the action of the city in laying out the street across its tracks, or made any positive objection, prior to 1900, to the travel over the crossing by such portion of the public as had occasion to drive to the southerly side of the railroad track. It is not in controversy that after the extension was laid out, planking was maintained at the crossing to render it suitable for teams to drive across.

The city contends that this was done to accommodate the public as well as those who used it for purposes connected with the business of the railroad, and that trains were sometimes moved and broken apart to prevent the interruption of public travel. The petitioner further

argues that the railroad company recognized the new location as a valid and binding one in 1872, by presenting a petition to the city government asking for permission to construct a log wharf for the purpose of filling up a portion of the "city slip or dock". It is accordingly contended that all these facts and circumstances aided by the probability that the city council would not lay out a street in defiance of the provisions of the act, are sufficient to "prove an implied consent" on the part of the railroad company.

On the other hand, it is earnestly contended in behalf of the defendant company that these circumstances, when critically examined in the light of the defendant's evidence, have no necessary tendency to prove actual consent on the part of the company and are wholly insufficient to warrant the conclusion that the company ever intentionally acquiesced in, or ratified the action of the city.

There is no direct evidence in the case that the railroad company ever had any actual knowledge of the laying out of this street across its tracks. The fact that none of its officials appeared at any hearing before the city council on the report of the street engineers, tends to show that it had no such knowledge. The change made by the city in the street after the action of the city council, if any material change was made, was not so marked as to attract the special attention of the company. It was not calculated to inform the company that a legal location of a public way was claimed by the city. There is evidence tending to show that after the extension was surveyed by the city engineer, the lower part of it continued to be used as a dumping place for the deposit of refuse material from the streets, but there is no testimony from the street commissioners or other city officials showing that any systematic work was ever done in the making of a street below the railroad tracks. No proof is presented that the city ever expended a single dollar in the actual construction of the street surveyed. Mr. Cram, who was station agent from 1870 to 1875, and subsequently superintendent of the E. & N. A. Railway was continuously at this station from 1870 to 1885. He testifies that he never heard that the city claimed to have extended Exchange Street across the railroad tracks, that he never knew that a street was actually constructed below the tracks and never saw any indica-

tion of the building of a street there. It is not in controversy that the whole property on both sides of this alleged street, and all the wharves there, were the property of the defendant company and under its control. In the conduct of its business it set cars on the tracks on the river side of the crossing for the purpose of loading and unloading, and the planked crossings were maintained to meet the requirements of the company in its own business. Such planking was maintained at other points where there was no pretense of a street crossing. Mr. Cram also states that there was substantially no travel across these tracks except in connection with railroad business, including that on the wharves under control of the company. Mr. Cram's testimony is corroborated by that of Mr. Weeks, who had charge of the company's property. He states that not one-half of one per cent of all the travel over the railroad tracks was for any other purpose than that connected with the business of the railroad.

It appears that in 1872, the E. & N. A. Railway Company presented a petition to the city government for leave to fill up "a portion of the dock at the river end of Exchange Street," with a log wharf, expressing its willingness "to pay therefor such sum as would protect the rights of the city in said dock." It appears from other evidence that this dock was uniformly mentioned as the "city slip" or "city dock" and there is no intimation in this petition that the railroad company understood the dock to be a part of Exchange Street. A contrary inference is fairly to be drawn from the result of this petition. The city council proposed to grant the permission, provided the wharf built by the company should be considered and maintained as a part of Exchange Street; but there is no proof in the case that the company ever accepted this proposition of the city council or acquiesced in the conditions thereby imposed. On the contrary, the inference is irresistible that the company refused to accede to the proposition, for the log wharf was not built and that part of the "city dock" has not been filled.

Furthermore, § 33, of chap. 51, R. S., declares that a board with the words "Railroad Crossing" painted upon it, shall be placed on a post or other structure on the side of a way where it is crossed by a railroad. But no such sign was ever maintained or erected at this

crossing, and the case fails to show that any complaint was ever made by anybody, that the absence of it was an omission to observe the requirement of the law. This fact the defendant argues has a very strong tendency to show that the railroad company never understood that there was a public street crossing there, but only a crossing established by the railroad in the conduct of its own business.

The crossing of a railroad track by a highway at grade has always been deemed a place of danger. The crossing in question was over lands occupied for station purposes at one of the most important stations on the road. It was provided by § 1, of chap. 167 of the laws of 1883, (R. S., c. 18, § 29), that such a public crossing should not be established "unless after notice and hearing the railroad commissioners adjudge that public convenience and necessity require it." As there was no such provision in existence in 1868, the legislature, recognizing the perils of such a crossing, sought by the special act of 1868, to guard against the probable danger to public travel incident to the crossing in question. It possessed the exclusive authority to permit a location below high water mark, and the sole power, at that time, to impose such conditions as would tend to protect the public against the dangers involved in it. There should be clear and convincing evidence that these requirements of the legislature were strictly observed. It appears from the plan and other evidence in the case that five railroad tracks are now used at this crossing to afford the required train service of five different railroad systems. It is the principal terminal station for freight trains on all eastern business, and switching engines are almost continually running over this crossing in moving freight cars and making up freight trains. It was on account of this frequent passage of more numerous trains and engines at this station and the multiplied dangers connected with the use of the crossing, that in 1900, the defendant company removed the planking and abolished the crossing in connection with its own business. It is obviously impracticable to establish any other than a grade crossing at this station, and in view of the inconsiderable extent of public travel at this point apart from the business of the railroad, and the importance of the question in its relation to the safety of public travel by rail as well as by teams, it is the opinion of the

court that more conclusive circumstantial evidence should be presented to warrant the inference that the railroad company actually consented to the location of the street across its tracks. The entire history of the matter suggests rather the probability that the action of the city council was taken in the expectation of obtaining the consent of the railroad company, but that the parties disagreed upon the terms and conditions of crossing and no definite result was ever reached.

But the petitioner finally contends, that if it be assumed that the consent of the railroad company was never obtained and the action of the city council was unauthorized, the public, since 1868, have gained a right by prescription to pass over the tracks of the defendant company. The defendant insists that there is no evidence in the case to justify this conclusion as a matter of fact, and furthermore, denies that under the laws of this State, as they have existed since 1883, a public way crossing a railroad can be established by prescription.

Attention has already been called to the provision of chapter 167 of the laws of 1883. Section 2 of the same act further declares that when any way is laid out across a railroad, the railroad commissioners "shall determine the manner and conditions of crossing such railroad." And a review of all the legislation upon the subject of railroad crossings in this State from 1878, to the present time, clearly shows a progressive tendency of legislative opinion in harmony with the judgment of this court as expressed *In re Railroad Commissioners*, 83 Maine, 273, that "public safety requires the intersection of railroad tracks and roads to be under the control of the railroad commissioners." See, also, *In re Railroad Commissioners*, 87 Maine, 247, and *Goding v. B. & A. Railroad Co.*, 94 Maine, 542. It was further provided by chap. 282 of the laws of 1889, that a "way may be laid out across, over or under any railroad track," "except that before such way shall be constructed, the railroad commissioners shall determine whether the way shall be permitted to cross at grade or not, and the manner and condition of crossing." Indeed, it has been the avowed policy of the State to place the entire subject matter under the jurisdiction and control of the railroad commissioners. To hold that a prescriptive right to cross a railroad track can be acquired by

an adverse public use during the existence of these statutes, would be wholly incompatible with the manifest spirit and purpose of this legislation and contrary to the settled policy of the State.   By § 148, of chap. 111, of the Revised Statutes of Massachusetts, the legislature of that State, ex majore cautela, declared in terms that no right of way by prescription can be gained over a railroad location or land used for railroad purposes.   But this explicit declaration was not required to show that such was the necessary and legitimate effect of the legislation upon the same subject in this State.   No action was ever taken by the railroad commissioners in regard to this crossing.

But it may be further remarked that the evidence reported, which has already been considered under the proposition of implied consent, is not sufficient to warrant the conclusion that after the legislative enactments above cited, a public way across the defendant's tracks was established by prescription.   To prove this it was incumbent on the plaintiff not merely to show an adverse public use under a claim of right, continued for twenty years, but also that during that period the defendant acquiesced in such use.   "And acquiescence implies that the defendant knew, or had reason to believe, that there was such an adverse use."   *Sprow* v. *B. & A. Railroad,* 163 Mass. 341.

This does not satisfactorily appear from the evidence in the case.

It is, accordingly, the opinion of the court, that upon the case reported the defendant ought not to be required to maintain a public crossing at Exchange Street in Bangor.

*Petition denied.*